TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Neil Berger
Brian F. Moore

*Attorneys for Albert Togut,*
  *Not Individually But Solely in His Capacity*
  *as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                               :
In re:                                                         :     Chapter 11
                                                               :
HELLO NEWMAN, INC.,                                            :     Case No. 16-12910 (SCC)
                                                               :
                        Debtor.                                :
                                                               :
---------------------------------------------------------------x

**CHAPTER 11 TRUSTEE'S APPLICATION FOR
AN ORDER AUTHORIZING TRUSTEE TO OBTAIN
POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364(c)**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Albert Togut, not individually but solely in his capacity as Chapter 11 trustee (the "Trustee") of the estate of Hello Newman, Inc., the debtor in the above-captioned case (the "Debtor"), by his attorneys, Togut, Segal & Segal LLP, hereby makes this application (the "Application") for the entry of a order ("Order"), substantially in the form annexed hereto as Exhibit A, authorizing the Trustee to obtain post-petition financing from Admar Investments LLC, an affiliate of LCP Jerry LLC (the "Lender") and related relief.  In support of the Application, the Trustee submits the Declaration of Neil Berger (the "Berger Declaration," annexed hereto as Exhibit B), and respectfully states:

**PRELIMINARY STATEMENT**

On August 18, 2017, this Court entered its *Findings of Fact and Conclusions of Law* [Dkt. No. 33] (the "Findings of Fact and Conclusions of Law"), and its *Order Granting Judgment* [Dkt. No. 34] (the "Order Granting Judgment"), and concluded that the Debtor's sole-asset, the house and real property located at 113 East 2nd Street, New York City, New York (the "Real Property"), must be sold by the Trustee to address allowed creditor claims and the expenses of this Chapter 11 case.

The Court found and ordered that as a prerequisite to the sale, Doris Kornish ("Kornish"), who currently resides at the Real Property in violation of the Court's Designation Order (defined below), must vacate and turn over possession of the Real Property to the Trustee no later than September 28, 2017. See Findings of Fact and Conclusions of Law, ¶53 ("The immediate turnover of the Real Property by Kornish to the Trustee is required for the sale of the Real Property by the Trustee, and is otherwise in the best interests of the Debtor's estate."); Order Granting Judgment, p. 4 ("**ORDERED**, that on or before September 12, 2017, Kornish shall vacate the Real Property…").

Kornish does not make payments for her unauthorized use and occupancy of the Real Property, and the Real Property does not generate any income. Moreover, Kornish does not appear to have the financial means to relocate or establish another residence.

Consequently, and as the Trustee previously previewed to the Court and parties in interest, the Trustee seeks authority to obtain a $300,000 post-petition facility from the Lender, which is an affiliate of LCP Jerry LLC, the holder of a Judgment of Foreclosure in the amount of $1,749,443.12 that is the senior lien against the Real

Property. The loan will be made by the Lender pursuant to Bankruptcy Code section 364(c) to enable the Trustee to address two immediate and necessary needs:

    a)    an initial advance of $50,000 will be drawn upon entry of the Order and used by the Trustee to maintain, insure, and safeguard the Real Property until it is sold; and

    b)    a second draw of up to $250,000 will be available to be advanced to Kornish to facilitate her relocation to another residence.

Absent the post-petition financing proposed by the Trustee, the estate will not be able to preserve and protect the Real Property, or facilitate Kornish's relocation to another residence, which is necessary for the Real Property to be sold and allowed claims paid. Consequently, the Trustee has concluded, in the exercise of his business judgment, that the proposed post-petition financing is in the best interests of the Debtor's estate and its creditors.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this Application pursuant to 28 U.S.C. §§ 157 and 1334. This mater is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The predicates for the relief requested herein are Sections 105(a), 362, and 364(c) of Title 11, United States Code (the "Bankruptcy Code"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

## BACKGROUND

### A. The Chapter 11 Case

3. On October 17, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court (the "Court") [Dkt. No. 1] to stay a foreclosure sale of the Real Property by the Lender.

4. No committee of unsecured creditors has been appointed in this case.

5. On February 23, 2017, the Court entered an *Order Directing the United States Trustee for the Southern District of New York* (the "United States Trustee") *to Appoint a Chapter 11 Trustee* [Dkt. No. 29].

6. On March 1, 2017, the United States Trustee filed his *Notice of Appointment of Trustee* [Dkt. No. 32] designating Albert Togut as the Chapter 11 trustee of the Debtor.

7. On March 2, 2017, the Court entered an *Order Approving the Appointment of Chapter 11 Trustee* [Dkt. No. 33], pursuant to which Albert Togut was appointed as Chapter 11 trustee herein. The Trustee has duly qualified and is acting as trustee of the Debtor.

### B. The Real Property

8. The Debtor purchased and obtained title to the Real Property on October 28, 1998. *See* Berger Declaration, ¶4. In its Schedules, the Debtor attributes a value of $14 million to the Real Property, and asserts that the Real Property is encumbered by mortgages and liens that secure obligations, all of which are in default, totaling $4,693,323.76. *See* Dkt. No. 1.

9. At all times since the Petition Date, Kornish has resided at the Real Property without paying any rent or otherwise compensating the Debtor for her use and occupancy. *See* Findings of Fact and Conclusions of Law, ¶53.

10. Prior to the Petition Date, Kornish, in her personal capacity and without any apparent authority, executed an agreement with a yoga studio (the "Yoga Studio") for the use of a certain portion of the Real Property referred to as "Apartment 1." *See* Berger Declaration, ¶8. The Yoga Studio terminated its use and occupancy of Apartment 1 on July 31, 2017. *See id.*

11. As a result of that termination, and Kornish's failure to compensate the Debtor for her use and occupancy, the Real Property generates no income. *See id.* ¶9. Accordingly, there is no income to pay property taxes, insurance premiums, assessments, governmental charges, costs and other expenses to maintain and safeguard the Real Property until it is sold. *See id.*

C. **The Debtor's Pre-Petition Secured Liabilities**

12. As of the date hereof, secured liens (the "Secured Liens") against the Real Property total approximately $4,992,207.92:

| Lienholder | Classification | Amount |
|---|---|---|
| Liens (Total of $4,922,207.92) | | |
| LCP Jerry LLC Judgment of Foreclosure and Sale | Secured | $1,845,893.67 |
| U.S Small Business Administration - Sweet Jane, LLC Mortgage | Secured | $544,892.32 |
| U.S Small Business Administration – Two Boots of 42nd Street, LLC | Secured | |
| U.S Small Business Administration – Pizzamonium, Inc. | Secured | |
| U.S Small Business Administration – Gelsimina, Inc. | Secured | |
| U.S Small Business Administration – | Secured | |

5

| Lienholder | Classification | Amount |
|---|---|---|
| Gelsimina, Inc., and Larry Tate of New York, Inc. | | |
| Knuckleknee, LLC Mortgage | Secured | $2,371,906 |
| NYCTL 2016-A Trust | Secured | $146,131.19 |
| NYC Department of Finance Tax Warrant | Secured | $12,484.74 |
| Environmental Control Board Liens | Secured | $900.00 |

*The LCP Jerry Mortgage and Foreclosure Judgment*

13. On or about August 4, 2005, the Debtor executed a Mortgage, Consolidation, Modification, and Extension Agreement (the "Consolidated Mortgage") in favor of HSBC, Bank USA National Association ("HSBC") in the amount of $1,878,346.91.

14. On or about December 31, 2014, HSBC assigned its interest in the Consolidated Mortgage to the Lender (the "LCP Jerry Mortgage"), and in August of 2014, the Debtor defaulted under the terms of the mortgage note associated with the LCP Jerry Mortgage.

15. On or about August 22, 2016, the Lender obtained the Judgment of Foreclosure and sale in the New York State Court in the amount of $1,749,443.12, plus interest. The Debtor filed the Petition to stay the foreclosure sale, scheduled by the Lender for October 19, 2016.

16. On or about February 15, 2017, the Lender filed its proof of claim [Claim No. 6] asserting a claim of $1,845,893.67. Interest accrues on the Judgment of Foreclosure at a default rate of nine and a half percent (9.5%) per annum.

6

### *The Knuckleknee Mortgage*

17. On or about April 8, 2013, the Debtor executed a Mortgage, Assignment of Leases and Rents, and Security Agreement in favor of Knuckleknee, LLC in the amount of $1,500,000 (the "Knuckleknee Mortgage").

18. On or about February 13, 2017, Knuckleknee LLC filed its proof of claim [Claim No. 5] asserting a claim of $2,371,906 for amounts due under the Knuckleknee Mortgage.

19. Debt service on the Knuckleknee Mortgage has not been made since December of 2014, and as of the date hereof, the Debtor remains in default of this mortgage. Interest on this claim is accruing at a default rate of twenty-four percent (24%) per annum.

### *Other Liens Against the Real Property*

20. In or around March and June of 2002, the Debtor executed five mortgages in favor of the United States Small Business Administration (the "SBA") totaling $906,900 (the "SBA Mortgages"). In its Schedules, the Debtor lists the secured claim of the SBA in the amount of $544,892.32.

21. NYCTL 2061-A Trust, successor in interest to the City of New York, asserts a lien against the Real Property in the amount of $146,131.19 on account of unpaid pre-petition real estate taxes. Furthermore, the New York City Department of Finance recorded a tax warrant against the Real Property in the amount of $12,484.74 on account of unpaid general corporate taxes.

22. Finally, Environmental Control Board Liens asserted against the Real Property total $900.

**D.    Kornish's Continued Possession of the Real Property**

23.    On April 19, 2017, the Court entered the *Order (I) Designating Doris Kornish as the Responsible Officer of the Debtor and (II) Compelling Her to Turn Over Property of the Estate to the Trustee and Otherwise Cooperate with the Trustee* [Dkt. No. 60] (the "Designation Order").

24.    The Designation Order designated Kornish as the person responsible to perform the duties of the Debtor in this case, and directed Kornish to turn over all property of the estate to, and otherwise cooperate with, the Trustee. *See* Designation Order, 1-2.

25.    To date, despite having no written lease or agreement with the Debtor, Kornish has refused to surrender possession of the Real Property to the Trustee[1] and she continues to occupy the Real Property. *See* Berger Declaration, ¶15.

26.    On May 31, 2017, the Trustee commenced an adversary proceeding (the "Adversary Proceeding") seeking, among other things, an order directing Kornish to (a) provide the Trustee and his authorized representatives with immediate access to the Real Property pursuant to Bankruptcy Code section 521, and (b) vacate, turn over and deliver possession of the Real Property to the Trustee pursuant to Bankruptcy Code section 542.

27.    On August 18, 2017, after notice and hearing, the Court entered the Findings of Fact and Conclusions of Law holding, among other things:

    a)    The Real Property is owned by the Debtor and is property of the Debtor's estate;

    b)    Kornish occupies and uses the Real Property without any valid agreement with the Debtor or the Trustee,

---

[1]    The Court has entered Orders directing Kornish to provide the Trustee access to the Real Property. *See, e.g.*, Dkt. No. 60; Adversary Proceeding, Dkt. No. 9; Dkt. No. 82.

8

        and she does not compensate the Trustee or the Debtor's estate for her use and occupancy of the Real Property;

   c)     The Real Property is subject to the Secured Liens;

   d)     The Real Property does not generate any income;

   e)     The Debtor does not have the ability to address any of the valid Secured Liens or the unsecured liabilities that have been asserted against it absent a sale of the Real Property by the Trustee;

   f)     The Debtor and Kornish are required to turn over possession of the Real Property to the Trustee pursuant to Bankruptcy Code section 542 and the Designation Order; and

   g)     The immediate turnover of the Real Property by Kornish to the Trustee is required for the sale of the Real Property by the Trustee, and is otherwise in the best interests of the Debtor's estate.

*See* Findings of Fact and Conclusions of Law, ¶53.

28.     On August 18, 2017, the Court entered the Order Granting Judgment providing, among other things, "on or before September 28, 2017, Kornish shall vacate the Real Property, and she may not re-enter the Real Property without prior written consent of the Trustee or an order of the Court obtained upon written request, notice, and a hearing."

E.     **The Only Known Way to Satisfy Creditor Claims is to Sell the Real Property**

29.     The Secured Liens against the Real Property have gone unpaid since before the Petition Date, and interest accrues daily on those claims. *See* Berger Declaration, ¶10.

30.     Both Phillip Hartman ("Hartman") and Kornish, each fifty percent (50%) shareholders of the Debtor, advised the Court and the Trustee that they have

9

attempted to refinance the Secured Liens against the Real Property, but neither of them have provided any evidence of any such refinancing. *See id.* ¶11.

31.     Moreover, in its Findings of Fact and Conclusions of Law, the Court held "[t]he Debtor does not have the ability to address or pay any of the Secured Claims and the other liabilities that have been asserted against it absent a sale of the Real Property by the Trustee." *See* Findings of Fact and Conclusions of Law, ¶33,27.

32.     The Trustee has determined in his business judgment that to achieve the highest return on any proposed sale, the Real Property must be sold vacant and unoccupied. *See* Berger Declaration, ¶12. Therefore, it is necessary to obtain post-petition financing to maintain and safeguard the Real Property until it's sold, and facilitate Kornish's relocation to another residence. *See id.* ¶17.

**RELIEF REQUESTED**

33.     The Trustee requests entry of the Order, pursuant to Bankruptcy Code sections 105(a), 362, and 364(c), Bankruptcy Rules 2002, 4001(c), and 9014, and Local Rule 4001-2, authorizing the Trustee to obtain access to a $300,000 post-petition facility (the "Post-Petition Financing Facility") and in accordance with the Mortgage, Assignment of Leases and Rents and Security Agreement (the "Post-Petition Financing Mortgage," annexed hereto as Exhibit C) and the Secured Promissory Note (the "Post-Petition Financing Note," annexed hereto as Exhibit D, together with the Post-Petition Financing Mortgage, the "Post-Petition Financing Documents") by and between the Trustee and the Lender.[2]

34.     In connection with the Post-Petition Facility and the Post-Petition Financing Documents, the Trustee also seeks:

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Post-Petition Financing Documents.

10

- authorization to grant the Lender a (i) superpriority administrative expense claim, pursuant to section 364(c)(1) of the Bankruptcy Code, and (ii) lien on the Real Property, pursuant to section 364(c)(3) of the Bankruptcy Code, subject only to the Carve-Out (defined below); and

- modification of the automatic stay, pursuant to section 362 of the Bankruptcy Code and Bankruptcy Rule 4001, to permit the Lender to file financing statements and related documents to evidence its security interests and to take other actions required or permitted by the Post-Petition Financing Documents.

35. The proceeds of the Post-Petition Financing Facility will be used to: (a) pay property taxes, insurance premiums, assessments, governmental charges, costs and other expenses to maintain, secure and otherwise safeguard the Real Property until it is sold, and (b) facilitate the relocation of Kornish to another residence.

## THE PROPOSED POST-PETITION FINANCING

36. The Trustee submits this concise statement pursuant to Bankruptcy Rules 4001(c) and Local Rule 4001-2, to set forth the material terms contained in the Post-Petition Financing Documents and the proposed Order.[3]

| **Material Terms of the Post-Petition Financing Facility** | |
|---|---|
| **Parties to the Post-Petition Financing Documents** | **Borrower**<br>Albert Togut, not individual but solely in his capacity as Chapter 11 Trustee of the Debtor<br><br>**Lender**<br>Admar Investments LLC<br>**Post-Petition Financing Note.** |
| **Commitments Under the Post-Petition Financing Facility** | Total aggregate term-loan commitment of up to $300,000 payable to Trustee by |

---

[3] In the event of any inconsistency between the description of the terms set forth in this Application and the Post-Petition Financing Documents or Order, the terms of the Post-Petition Financing Documents and the Order, as applicable, shall govern.

11

| **Material Terms of the Post-Petition Financing Facility** ||
|---|---|
| | Lender in two advances.  **Post-Petition Financing Note.** |
| | The initial advance shall be in the sum of $50,000 and made upon notification from Trustee to Lender in the form provided for in the Post-Petition Financing Note. **Post-Petition Financing Note, ¶2(a).** |
| | The second advance of up to $250,000 will be made to Kornish as an advance against any distribution to which she may be entitled from the proceeds of the sale of the Real Property, to facilitate her move to another residence. **Order, ¶12.** |
| | Prior to the payment of any advance under the Post-Petition Financing Documents and the Order, Doris Kornish must have:<br>• Vacated the Real Property;<br>• Designated and disclosed to the Trustee in writing a bank account that she maintains and into which the Trustee may disburse such advance;  and<br>• Provided such other documents as may be reasonably requested by the Trustee to ensure that the advance will facilitate Kornish's move from the Real Property to another residence.<br>**Order, ¶11.** |
| **Purpose of the Post-Petition Financing Facility** | Proceeds of the Post-Petition Financing Facility may be used to:<br>• Pay property taxes, insurance premiums, assessments, governmental charges, costs and other expenses to maintain, secure and otherwise safeguard the Real Property;  and<br>• Facilitate the relocation of Kornish to another residence.<br>**Post-Petition Financing Note, ¶2(b).** |
| **Maturity Date of Post-Petition Financing Note** | September 7, 2018. **Post-Petition Financing Note.** |
| **Rate of Interest** | Interest Rate: 10%. **Post-Petition Financing Note.**<br><br>Default Rate: Lesser of 14%, or maximum |

| **Material Terms of the Post-Petition Financing Facility** ||
|---|---|
| | rate allowed by law. **Post-Petition Financing Note, ¶5.4.** |
| **Events of Default** | The failure to make any payment required under the Post-Petition Financing Note or a default under any of the Post-Petition Financing Documents. **Post-Petition Financing Note, ¶5.1.** <br><br> In the event of an uncured Event of Default, as defined in the Post-Petition Financing Documents, the Lender, its successors and/or assigns, may declare the entire debt due under the Post-Petition Financing Note to be immediately due and payable and may seek an order of the Court upon five (5) business days prior written notice to the Trustee and other parties in interest modifying the automatic stay for authority to enforce of its state law rights and remedies against the Real Property. **Order, ¶3.** |
| **Expenses and Fees** | On the date of each Advance, a fully earned fee of 2% of the Advance will be added to the Principal Sum. The reasonable fees and expenses of Lender's counsel in connection with preparing and negotiating the Post-Petition Financing Documents and the transactions contemplated thereby will be made part of the secured debt to be paid to the Lender. **Post-Petition Financing Note, ¶6.** |
| **Collateral and Priority** | Liens: Obligations due under the Post-Petition Financing Note shall be secured by a lien against the Real Property, the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon, subject to existing perfected liens against the Real Property pursuant to Bankruptcy Code section 364(c)(3). **Post-Petition Financing Mortgage, ¶2; Order, ¶4.** <br><br> Superpriority Claims: Subject to the Carve-Out (as defined below), the obligations due under the Post-Petition Financing |

13

| Material Terms of the Post-Petition Financing Facility ||
|---|---|
| | Documents shall be granted the status of an allowed superpriority administrative expense claim of the estate pursuant to Bankruptcy Code section 364(c)(1), which shall not at anytime be made subject or subordinate to, or made pari passu with, any other lien, security interest or claim against the Property, existing as of the date that the financing under the Post-Petition Financing Documents is consummated, or any lien created under Bankruptcy Code section 364(d) or otherwise.  **Order, ¶4.** |
| **Carve-Out** | Any superpriority claim provided for in the Post-Petition Financing Documents is:<br>• Subject to the allowed fees and expenses of the Trustee and his retained professionals, which shall be fixed and allowed by the Bankruptcy Court upon written application(s), notice and a hearing, subject to all of the Lender's rights to object and be heard;  and<br>• Shall exclude any right, lien, claim or interest in any causes of action or rights arising under Chapter 5 of the Bankruptcy Code or any similar state or Federal law in favor of the Trustee or the Debtor's estate (the "<u>Carve-Out</u>"). **Order, ¶4.** |
| **Automatic Stay** | The automatic stay imposed under Bankruptcy Code section 362(a) shall be modified, as to the Lender only, to allow implementation of the provisions of the Post-Petition Financing Note and Order. **Order, ¶5.** |

## BASIS FOR RELIEF REQUESTED

37.    Section 364 of the Bankruptcy Code distinguishes among obtaining (a) unsecured credit in the ordinary course of business, (b) unsecured credit out of the ordinary course of business, and (c) credit with specialized priority or security.  If a debtor in possession or trustee cannot obtain post-petition credit on an unsecured basis, the Court may authorize the trustee to obtain credit or incur debt, repayment of which

14

is entitled to superpriority administrative expense status or secured by a lien on unencumbered property, a junior lien on encumbered property, or a combination of these protections. *See* 11 U.S.C. § 364(c).

38. The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and a hearing, that the trustee is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." 11 U.S.C. § 364(c)*; see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code). Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

> (i) The debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);
>
> (ii) The credit transaction is necessary to preserve the assets of the estate; and
>
> (iii) The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Acqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and finding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

15

A. **Efforts to Obtain Post-Petition Financing**

39. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). A trustee need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c). *See e.g. In re Snowshoe*, 789 F.2d. at 1088. When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

40. It is clear that the Trustee would not be able to obtain unsecured financing in this case. Kornish alone occupies the Debtor's sole-asset without authorization, and without providing any compensation to the estate. The Real Property, which is already subject to the perfected and valid Secured Liens that total at least $4.9 million, all of which are in default, does not produce any income that could satisfy monthly debt service on account of a post-petition loan. Moreover, neither Hartman nor Kornish produced a willing lender to refinance the Secured Liens despite having been given an opportunity to do so.

41. Under these circumstances, it is readily apparent that parties would not lend money to the Trustee without the protections provided in Bankruptcy Code section 364(c), and that the Lender is the most likely candidate to make a loan to the Trustee, because the Post-Petition Facility will enhance the ability if its affiliate LCP

16

Jerry LLC to be paid on account of the Judgment of Foreclosure. *See* Berger Declaration, ¶18. Accordingly, the Trustee determined to pursue financing from the Lender. *See id.*

**B.     The Post-Petition Financing Facility is
        Necessary to Preserve the Real Property**

42.     Access to the Post-Petition Financing Facility is essential to the success of any proposed sale of the Real Property and the administration of the Chapter 11 case. *See id.* ¶19. The Yoga Studio ended its use and occupancy of Apartment 1 and is no longer making use and occupancy payments. Consequently, the Real Property is no longer generating any income to pay property taxes, insurance premiums, costs, and other expenses necessary to safeguard and maintain the Real Property. Accordingly, the Post-Petition Financing Facility is essential to the administration of the Chapter 11 case and, therefore, will benefit the Debtor's creditors. *See id.*

43.     Furthermore, the Post-Petition Financing Facility is necessary for the estate to maximize the value of the Real Property in connection with the sale by the Trustee. To achieve the highest and best offer at any proposed sale, the Real Property must be sold vacant and unoccupied. *See id.* ¶20. Kornish does not appear to have the financial means to relocate from the Real Property to another residence.[4] *See id.* Therefore, the Post-Petition Financing Facility is also necessary to help Kornish move to another residence. *See id.*

**C.     The Terms of the Post-Petition Financing Facility Are
        Fair, Reasonable, and Appropriate and Represent the
        Sound Exercise of the Trustee's Business Judgment**

44.     As set forth in the Berger Declaration and herein, the Trustee has concluded that the Post-Petition Financing Facility is the best alternative available for

---

[4]  It should be noted that pursuant to the Order, any advance to Kornish to facilitate her relocation will constitute an advance against amounts she may be entitled receive of the net sale proceeds of the Real Property.

17

post-petition financing. *See* Berger Declaration, ¶21. Specifically, the terms of the Post-Petition Financing Facility are reasonable in that the applicable interest rate is reasonable under the circumstances of this case and the Lender has not (i) sought additional fees (*i.e.*, commitment fees, exit fees, monitoring fees, etc.) that are customary in post-petition financings, (ii) insisted on a priming lien to subordinate other secured creditors' interests in the Real Property, or (iii) sought to obtain liens on the estate's avoidance actions. *See id.* Consequently, the Post-Petition Financing Facility appears to be the best financing option available under the circumstances of the Chapter 11 case. *See id*.

45. Moreover, the Trustee submits that he has exercised his business judgment in determining the economics and necessity of the Post-Petition Financing Facility, and, further, has satisfied the legal prerequisites for incurring debt pursuant section 364(c) of the Bankruptcy Code. *See id.* ¶22. Accordingly, the Trustee respectfully requests that he be authorized to borrow funds from the Lender on a secured and superpriority basis, pursuant to sections 364(c) of the Bankruptcy Code.

D. **Modification of the Automatic Stay is Appropriate Under the Circumstances**

46. Paragraph 5 of the Order provides that the Automatic Stay provided for under section 362(a) of the Bankruptcy Code will be modified to the extent contemplated by the provisions of the Post-Petition Financing Documents, as described above. Stay modification provisions of this sort are ordinary and usual features of post-petition financing facilities and are reasonable under the present circumstances. Accordingly, the Trustee requests that the Court modify the automatic stay to the extent contemplated under the Post-Petition Financing Documents, and the proposed Order.

## NOTICE

47. Notice of this Application, and the annexed Order has been served upon: (a) Kornish, at 113 East 2nd Street, New York, New York 10009; (b) counsel for Lender; (c) counsel to the Debtor; (d) counsel for Mr. Hartman; (e) the United States Trustee; (f) all of the Debtor's known creditors; (g) all parties that have recorded liens against the Real Property; and (h) all parties that have filed a Notice of Appearance in this case.

## NO PRIOR REQUEST

48. No previous request for the relief sought herein has been made to this or any other Court.

## CONCLUSION

**WHEREFORE**, the Trustee respectfully requests that the Court grant the relief requested herein and such other and further relief as is just.

DATED:  New York, New York
        September 11, 2017

ALBERT TOGUT, not individually but solely in his capacity as Chapter 11 Trustee,
By His Attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Neil Berger*
NEIL BERGER
A Member of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000